IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 11-6001-RHW-1 |
| | ) | CR 11-6001-RHW-2 |
| Plaintiff, | ) | CR 11-6001-RHW-3 |
| | ) | CR 11-6001-RHW-4 |
| VS. | ) | CR 11-6001-RHW-5 |
| | ) | CR 11-6001-RHW-6 |
| LYNN J. OLSEN, II, et al., | ) | CR-11-6001-RHW-7 |
| | ) | |
| Defendants. | ) | Richland, Washington |
| _____ | ) | Tuesday, September 20, 2011 |

**PARTIAL TRANSCRIPT OF MOTION HEARING**

BEFORE THE HONORABLE ROBERT H. WHALEY

UNITED STATES DISTRICT COURT JUDGE

REPORTED BY:          Stephanie Smithson, CRR, RMR

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

```
 1    APPEARANCES:

 2

 3    For Plaintiff:        Michael C. Ormsby
                            United States Attorney
                            920 W. Riverside, Suite 300
 4                          Spokane, Washington 99210
                      BY:  ANDREW SEAN BIVIANO
 5                          Assistant United States Attorney
                            TYLER HOWARD LOUIS TORNABENE
 6                          Assistant United States Attorney

 7

 8    For Defendants:       JOHN ADAMS MOORE, JR., ESQ.
                            217 North Second Street
                            Yakima, Washington 98901
 9
                            IRWIN H. SCHWARTZ, ESQ.
10                          710 Cherry Street
                            Seattle, Washington 98104
11
                            MARK EDMUND VOVOS, ESQ.
12                          West 1309 Dean, Suite 100
                            Spokane, Washington 99201
13
                            RICHARD A. SMITH, ESQ.
14                          314 North Second Street
                            Yakima, Washington 98901
15
                            R. BRUCE JOHNSTON, ESQ.
16                          200 Winslow Way West, Suite 300
                            Bainbridge Island, Washington 98110
17

18

19

20

21

22

23

24

25
```

```
 1   TUESDAY, SEPTEMBER 20, 2011                      10:34 A.M.

 2                    P R O C E E D I N G S

 3                         ---o0o---

 4                          * * * * *

 5          THE COURT:  How long do you think you'll take to try

 6   this case, the government's case?

 7          MR. TORNABENE:  Your Honor, I would estimate the

 8   government's case in chief -- and, again, trying to take into

 9   account the number of defendants and cross-examinations -- we

10   would anticipate our case in chief would be inside of four

11   weeks.  I would say three, but I may be being -- giving the

12   Court a liberal estimate.

13          THE COURT:  All right.  Well, having said that, the

14   dates that I came up with wouldn't work.  The case will have to

15   go into at least June.  A month.

16          Is there any way I can do it earlier than that?

17          How's June the 4th?

18          MR. SCHWARTZ:  Your Honor, that's square in the

19   middle of their harvest growing season.  So that's a real

20   problem.  What would be the earliest?

21          THE COURT:  Let me give you these dates, because I

22   didn't go any farther not thinking that I had to.  I could try

23   it on any Monday starting June or July.  I don't particularly

24   want to be down here in August.  Why don't you think about that,

25   and then we'll talk about it later.
```

1    Now, I didn't know this was a four-week case until

2    today.  I think the estimate was less than that last time.

3    **MR. TORNABENE:**  Your Honor, I apologize.  The Court

4    caught me off guard.  I need to remember what I represented to

5    the Court, because nothing's changed since my last

6    representation to the Court.  So I may be just speaking off of

7    the cuff a little bit too quickly.

8    **THE COURT:**  Well, my problem is I don't remember

9    where I got the -- I had some information from someplace it was

10   about a three-week trial, but I can't remember if it's what you

11   said or some defendant said.  So I'm not saying you've changed

12   your position.  But in my head, it was a three-week trial, and

13   that's what Michelle thought.  Okay.

14   All right.  Have you decided how you want to proceed?

15   **MR. MOORE:**  Adam Moore for Mr. Olsen and Olsen Ag.

16   Mr. Smith and I worked on these together, and I think

17   the most efficient way this morning to use some time before your

18   Honor is that we split up our argument.  Mr. Smith is more in

19   tune with the specific dates and transactions and so on.

20   One of my contributions to the motion practice

21   regarding collateral estoppel was the approach to break it down,

22   you might say, by litigation or transaction.  Whether it was --

23   it wound up in front of Judge McDonald, that would be one

24   approach, Judge Van Sickle, another approach, whether it was the

25   NAD hearing, which was administratively conducted and later

1   appealed, in other words, try to identify the species of

2   litigation and then address a motion based on that individual

3   species of litigation and so on.  So we have multiple motions.

4          And I believe it's simpler than that, actually.  But

5   that's how we approached it.  To blend all together seemed

6   impossibly complex, and so we deconstructed it in that way, but

7   I think the essence of it is it doesn't matter.

8          Each release refers to the subject matter of this

9   release, and the subject matter is not this finite litigation or

10  series of package of issues.  It's all more generally stated as

11  the indemnity payment in such a crop year to so and so as being

12  the subject matter of the release.

13         The simple analysis is to simply looking at the plain

14  meaning of what the releases said and who drafted it.  You

15  construe ambiguity against the draftsman.

16         So here we have a series of releases that release so

17  and so, a grower, from all liabilities, claims and so on,

18  growing out of or arising from the subject matter without

19  limitation.  They don't address specifically the reservation of

20  rights to indict and prosecute until the very last release.

21         My client in the blue shirt in 2010 -- it's Exhibit

22  30 in our material -- U.S. Attorney Rolf Tangvald drafted the

23  release instead of the attorney in private practice, I believe

24  Mr. Raekes.  Mr. Tangvald showed that the government knows how

25  to draft the release, and a comparative reading of that around

1    page 4 and 5 reserves the right to indict, probably, five times

2    in express language.

3         Mr. Olsen unhappily signed that believing that if he

4    agreed to pay $200,000 to the government every fall until he's

5    paid a million and a half dollars or something like that,

6    thought that was the end of it, but that so-called release

7    clearly reserves the right to prosecute multiple -- there's a

8    multiple recitation of that right.  That doesn't appear in any

9    of these other releases.  They all go to the subject matter and

10   release all claims and liabilities whatsoever to all heirs and

11   all of that.  So what does that mean?

12        You have this agency, the FCIA, Federal Crop

13   Insurance Association or whatever and an insurance company or

14   two or three.  One of which had gone broke.  And Mr., I think,

15   Hovland of the FCIA signed all these releases.  So the

16   government is saying, well, you know, all these releases are

17   just this agency, the FCIA, and they don't bind Uncle Sam, they

18   don't bind the government in a larger sphere.

19        So our research --

20        **THE COURT:**  Let me interrupt.

21        **MR. MOORE:**  Yes, your Honor.

22        **THE COURT:**  I wasn't going to.  But my understanding

23   is FCIA is not a agency of the government or an agency.  RMA may

24   be, and FCIC may be, but I don't know if FCIA is.

25        **MR. MOORE:**  I don't know.

1    **THE COURT:**  Hovland, in other words, was not employed

2    by a government agency.  So that's the reason I interrupted.

3    It's kind of critical to your argument.

4    **MR. MOORE:**  Okay.

5    **THE COURT:**  Mr. Smith's nodding.  So I...

6    **MR. MOORE:**  If he's nodding, then he's right.  And

7    I'm -- I'm being more general here in the opening remarks.

8    I don't know what -- I believe the F in FCI means

9    federal.

10    No?

11    (Brief pause; counsel conferring.)

12    **MR. MOORE:**  I concede that point.  The F is farmers,

13    and it's not a federal agency, I suppose.  I mean, I don't know

14    who pays them or anything like that.

15    However, and I submitted an easy way to look at what

16    we're talking about is Document 273.

17    **THE COURT:**  Where is it in the exhibits you filed for

18    me to look at?

19    **MR. MOORE:**  Well, 273 is called our amended reply to

20    the government's response re motions to dismiss based on

21    estoppel.  We filed this September 12th.  So it's fairly

22    recent.  The reason -- and I'll summarize it for the Court, but

23    I thought if the Court would make a note and look at it when the

24    Court had time.

25    **THE COURT:**  It really helps to look at things now.

STEPHANIE SMITHSON, CRR, RMR

1       **MR. MOORE:** Okay.

2       **THE COURT:** Because my memory's going to be like

3   yours.  You have it, put on the ELMO, maybe.

4       **MR. MOORE:** Does your Honor have a copy now?

5       **THE COURT:** I think so.  Exhibit what?

6       **MR. MOORE:** It's not an exhibit.  It's Document 273.

7       **THE COURT:** I've got that.

8       **MR. MOORE:** Okay.  Good.  Good.  Because I'll be

9   referring to that.

10      **THE COURT:** All right.

11      **MR. MOORE:** And that's pretty much what I'm going to

12  say, and then Mr. Smith can deal with the more detailed factual

13  analysis.

14      But, basically, at page 3 of that document through

15  page 8 is the core of our position regarding privity, and

16  attached to that document are the exhibits that we referred to.

17  And we took the time as scribners to copy the relevant passages

18  from various e-mails and letters and so on.  So the whole

19  package is there of really everything that we've got to say

20  about this.

21      Now, this document is a more general treatment.  It

22  doesn't take and break it down and deconstruct it the way our

23  motions did by each piece of litigation.  This takes it to show

24  the role of the government, the RMA primarily, in basically

25  controlling the FCIA.

1           And if the Court would look at page 3 at line 14 and

2   a half, we say, "Take, for example, the April 11th, 2005,

3   letter from David Paul to Michael Hand."  Now, Paul is the guy

4   in the Spokane Valley office of the RMA.  He's clearly RMA.

5   Mr. Hand appears to be his boss, the deputy administrator of the

6   compliance decision of RMA.  So this is a letter among RMA

7   people.

8           And the subject matter that Mr. Paul is bringing to

9   Mr. Hand's attention is that the potato processing

10  contracts/potential fraud cases, which we point out at line 19

11  and a half.

12          And then there's a quote that flows on the bottom of

13  page 3 onto most of page -- well, all of page 4.  In that quote

14  at page 3 at line 24, it talks about a fellow name Steve

15  Tillotson.  Mr. Tillotson is the main criminal investigator in

16  this case.  His name appears all over the grand jury the two

17  times they had him before the grand jury and in many of the

18  reports.  And he's with the OIG, the Office of Investigator

19  General.

20          And, basically, this letter then lays out what

21  Mr. Tillotson and Mr. Paul think is going on.  And on page 4,

22  there's three paragraphs that are quoted in the center of page

23  4, basically, name these defendants and sets forth what is sort

24  of the gravamen of the indictment.  $17 a ton versus $32 a ton,

25  specific gravity of 1.709, 90 percent bruise-free.  Those are

1    the criteria for rejection.

2            They're not really processing contracts.  Processing

3    contracts are frying, cutting up french fries and so forth and

4    not selling whole potatoes.  Those are fresh contracts.  When

5    you sell a baker -- you go to the supermarket and buy a baked

6    potato, that's a fresh produce.  But these are semantics.

7            But, clearly, the level of detail in that letter of

8    April 11, '05 among these RMA guys is the criminal investigation

9    summary of Tillotson.

10           And then the real important thing once that is

11   clearly understood is at the bottom of 4 and over to the top of

12   5, because in summary --

13           And by the way, this letter is Exhibit 7 in this

14   submission, and it's also in our documents one -- it's Exhibit 7

15   in our prior filing of exhibits, and I believe it's attached to

16   the back end of this submission here for the Court's use of

17   reference.

18           Anyway, here's what it said.  The FCIA -- I'm reading

19   at the bottom of page 4.  The FCIA is looking for guidance from

20   RMA.  It's right there.

21           **THE COURT:**  I've read these.

22           **MR. MOORE:**  Okay.  Okay.  And so that starts the ball

23   rolling.  FCIA wants guidance, and they want the RMA to help

24   them determine.

25           And then the next thing -- and this is sort of a

1   factual script -- April 29th.  This is on page 5 at line 14.

2   Michael Hand, David Paul's boss, wrote to Dave Hovland who's

3   with Farmer's Crop Insurance.  So here's a direct --

4           THE COURT:  That's the letter I was describing when I

5   talked to Mr. Smith.

6           MR. MOORE:  Right.  I won't beat a dead horse if your

7   Honor's familiar with the letter.

8           THE COURT:  I am.

9           MR. MOORE:  Okay.

10          THE COURT:  That's why I was citing what happened

11  later.

12          MR. MOORE:  Okay.  All right.  Getting there now.  If

13  you turn to page 6 at line 14 and a half, the next thing is an

14  e-mail stream on May 3rd of '05.  This is the first thing we've

15  been able to find following the April 29th letter.  And here a

16  strategy -- you can see when you follow and trace through these

17  e-mails a strategy is emerging.  And one of the documents says,

18  quote -- this is at line 16 -- "cover language to appease our

19  legal friends."

20          THE COURT:  Which document?

21          MR. MOORE:  A reference to not publishing the facts.

22          THE COURT:  Which document?

23          MR. MOORE:  Well, let's see.  The e-mails are in

24  Exhibit 9 attached, which is page 24 handwritten.

25                       (Pause in proceedings)

1          **MR. MOORE:**  At the very top of that page from Michael

2     Hand to Dave Paul, "It is cover language to appease our legal

3     friends.  FCIA shouldn't be concerned, and the affiliate

4     reference wasn't an accident."

5          There's an earlier fax where a handwritten entry is

6     made -- and I'm not sure it's in these exhibits -- to not

7     circulate this or publish it, and that shows a lack of

8     transparency.

9          Then it says -- I'm still on that exhibit, Exhibit

10    9 -- in the e-mail from Dave Paul to Michael Hand in the center

11    of that page just above the signoff "Dave", "FCIA has been

12    working closely with RMA in establishing liability and servicing

13    these policies."

14         Okay.  I'm trying to lay out what I think is a simple

15    analysis of this.  The cases that I read on collateral estoppel

16    talk about privity can be based upon control.  They're replete

17    with references to a hidden party who it turns out really isn't

18    privity because of control.

19         Now, this statement, "FCIA has been working closely

20    with RMA in servicing these policies", to me is an admission of

21    control.

22         And it says, The contracts received by FCIA were even

23    sent to PDD.  I think that's some sort of arm of RMA.  Although,

24    it's not obvious.

25         But they're definitely involved at that stage, and

1    that's the significance of the e-mail stream on May 3rd, 2005.

2    FCIA is supplying the potato contracts to RMA.  And the e-mail

3    even went to someone named Susan Choy, the director of

4    regional -- western regional compliance of RMA.  I believe she's

5    a highly placed person in that agency.

6              Then Exhibit 11 which is appended --

7              Oh.  Let me pause in Exhibit 10.  I was struggling

8    before to answer what was being -- the cover language "to

9    appease our legal friends" is a reference to Exhibit 10, which

10   is the fax coversheet to Attorney Raekes from Kevin Swanson.

11   "Comments:  At this point, FCIC is asking that we not make this

12   letter, quote, 'public', end quote, due to the pending

13   investigation."

14             All right.  I would very much like to ask Kevin

15   Swanson questions about this Exhibit 10, because it raises more

16   questions than it answers in my mind, but there it is.  They

17   want to keep it secret.

18             Exhibit 11 is the last e-mail in the stream, and all

19   of the decisionmakers agreed to set up a telephonic conference

20   in this one.  That's what they're talking about.  I'm sorry.

21   It's got three page numbers, page 87, 28 and 50.  I think

22   we've -- we're recycling it from an earlier submission.  So it

23   has page 87 on it, but page 28 handwritten is the controlling

24   digits here.

25             Here they're setting up, "Subject:  Re:  Poco, LLC,

1   Olsen Ag, Inc, Gordon Brothers."  This is from Dave Hovland to

2   himself to Michael Hand, Dave Paul -- Bruce Green is bgreen.

3   He's a private lawyer for the agency -- Kevin Swanson, John

4   Raekes, and they're -- Mr. Hand is being thanked for the

5   April 29th letter regarding the above policies.

6            Next paragraph, "The fact the clock is ticking on

7   some of the claims, would you be available to visit with us

8   about the concerns in a conference call this afternoon."  So

9   they set up a conference call.

10           Then --

11           **THE COURT:**  Mr. Moore, I don't mind listening to you,

12   but you're going to run out of time for your side, because it's

13   been almost 25 minutes.

14           **MR. MOORE:**  I'm almost there.

15           Exhibit 5 is a time slip by Attorney Raekes, and it

16   shows the day of the conference call.  He billed for it.

17           Then you get to the exhibit regarding the conference

18   call, which certainly invites questioning at an evidentiary

19   hearing.  That's Exhibit 13 attached.  There's a couple of pages

20   handwritten.  We believe it's in the handwriting of Dave Paul,

21   but he never signs it.  This is what I call the Oclaire memo

22   spelling of Oclaire, O-C-L-A-I-R-E, which is the home office of

23   the agency.  It's Eau Claire, E-A-U Claire, a city in Wisconsin.

24   And here they're laying out strategy.  This became their

25   strategy.  Now I could take quite awhile parsing through that,

1    but I think that's an important document.

2              THE COURT:  If it lays out their strategy, it's not

3    evident to me.  If you have something you want me to look at.

4              MR. MOORE:  Well --

5              THE COURT:  It's kind of cryptic.

6              MR. MOORE:  I know.  I want you to look at whoever

7    wrote these notes while they explain --

8              THE COURT:  No.  I understand that.  But you're

9    saying this lays out their strategy.  So I wanted you to --

10   instead of skipping it, you've gotten to something that I don't

11   see how it does, but it might.  I'm not arguing with you.

12             MR. MOORE:  Let me just get to what I think are the

13   hints.

14             It talks about federal arbitration on page 33

15   handwritten in heavy pen about 4 inches from the top.  "Federal

16   arbitration".  Okay.  That's one of these chunks of litigation

17   that we're talking about.

18             Then it mentions just below that an inch "RMA letter

19   of 4/29 requesting not to pay."

20             Then it goes -- there's a line across the page,

21   "Poco, O 1.4 million arbitration judgment."  "AGR 2003 potato

22   processing endorsement 565,000, specific gravity," and so on.

23   They're talking about these claims in this meeting.  And they're

24   all there.

25             Then they go to "Olsen Ag" below another line across

1   the page, "specific gravity", and large amounts of money.  And

2   then "Gordon Brothers."

3           The next page.  "Qualifying person."  That was one of

4   the arguments they raised about Mr. Peterson, that he wasn't a

5   qualifying person, because he didn't grow the right combination

6   of crops.

7           Then they say, "John Raekes.  Go to federal court

8   versus sympathetic arbitrator."  They're talking about strategy

9   here.  And who's talking about it?

10          RMA people at very high levels and FCIA people.

11          And then "Michael Hand."  I'm almost in the middle of

12  the page 34.  "Maybe get letter from OIG to stop payment" of an

13  indemnity check.  "May come down to not paying by way of

14  reinsurance."

15          And then the very last entry, "Kevin".  That's got to

16  be Swanson.  "Does potato contract meet" production or producer

17  "requirements."  They're talking about all of these issues.

18          And then a letter -- well, there's some e-mails at

19  the next exhibit, and they result in the letter which is Exhibit

20  16 to my client, Mr. Olsen.

21          And the strategy that they're discussing in Exhibit

22  14, Kevin Swanson, Mr. Raekes, Mr. Green, "Subject:  Re:

23  Meeting with Blake Bennett, Tri-Cities Produce."  That's

24  Mr. Vovos' client.

25          Then it says -- this is about the top of the page 37,

1    "Per my conversation with Dave Hovland, we will begin the

2    process of denying the 2004 MPCI claims (Olsen Ag & Poco, LLC)

3    on the premise that the processor contracts are not valid.  Then

4    it is my understanding that we will go to court to ask for a

5    summary judgment on the validity of these contracts."

6          Probably, that's when they went to Judge Van Sickle

7    in a dec action, and he said they were processing contracts.

8    That's one of those issues.  And so on.  I mean, this is the

9    plan that grew out of the telephone conference call.

10          And then the last exhibit is the letter to my client,

11   A denial letter.

12          Now, we think that that strategy was hatched in those

13   following -- in those preceding contacts with the government.

14   Albeit, they are a bit vague.  There's some suggestion they were

15   intentionally vague.  There was probably a multitude of other

16   contacts that they didn't record on paper.

17          **THE COURT:**  Assuming I believe this is true, why

18   would the government be bound by a subsequent release?

19          **MR. MOORE:**  If they were in privity with the FCIA,

20   it's the same as if they signed the release, as well.  And we

21   maintain they were in privity.  When they say a release of all

22   claims, that's all claims.

23          **THE COURT:**  That's a legal issue as to whether the

24   signature of a civil release would preclude the government from

25   a criminal prosecution.

1    **MR. MOORE:**  Absolutely.  If the government was in

2    privity with the releaser.

3    **THE COURT:**  That went to my first question.  Assuming

4    the government actually signed these materials, what would the

5    effect be?

6    **MR. MOORE:**  It's the same thing as if the government

7    actually signed it.

8    **THE COURT:**  You're saying these documents are what

9    you would rely on to show that the government is in privity and

10   is bound by the release?

11   **MR. MOORE:**  Yes.  We'd like to find more documents,

12   but we think these are enough to raise the issue at least to

13   have an evidentiary hearing to ask what these guys what's going

14   on behind the scene.

15       Mr. Smith --

16       Is there any more time?

17   **THE COURT:**  You ate it up.

18   **MR. MOORE:**  I ate it up.

19   **THE COURT:**  I want to hear from him.  If I have to go

20   after noon, I will, but we could be here for days if I don't put

21   some --

22   **MR. MOORE:**  Can he address the Court now?

23   **THE COURT:**  Oh, yes.  Yes.

24   **MR. SMITH:**  Your Honor, I think Mr. Moore has

25   summarized that.  That -- I guess I want to start out by saying

1    this.

2            THE COURT:  Let me ask you this.  It occurs -- what

3    is the significance from your perspective of the notes which

4    seem to reflect that the government and the private insurer were

5    aware of the problems that are now addressed in the indictment

6    of the specific gravity of the potatoes and whether they were

7    going to a processor and discussed it in a meeting, but that

8    position is not used in litigation to stop payment under the

9    contract?

10            In other words, that argument's never raised in

11    the -- to the arbitrator or to the judges.  It has to do with

12    whether people are processors or not and so forth, but the

13    underlying facts that result in the indictment -- although it

14    discussed prior to this letter that says we're not going to pay,

15    don't -- is not referred to.

16            MR. SMITH:  Well, I hope I can answer that.

17            THE COURT:  Has that occurred to you?

18            MR. SMITH:  Oh, yeah.  Yeah.  Here's what I think it

19    is.  I think the way we characterized it was --

20            THE COURT:  The reason I say that is it may -- and

21    I'll hear from the government -- it may be one of those things

22    that justifies a hearing, because it may well be the government

23    was controlling exactly how this went, because they wanted to

24    preserve the issue of whether or not the underlying contracts

25    were not fraudulent.  So by not including it in the civil

1   litigation, it could proceed separately in a criminal case, and,

2   therefore, they didn't want it to be included as a reason to

3   deny the payment.  They wanted to use these other things that

4   were ultimately lost.  I don't know if it makes any difference

5   legally, but it seems to me it's a motive for -- I would --

6   that's why I'm putting it for the government.  I would be

7   surprised that when -- I think it's in this -- yeah.

8          Under the notes of the meeting "Olsen Ag", "specific

9   gravity", while it's cryptic, it's one of the things that's

10  alleged in this case.  You can infer from that they were

11  discussing those problems as reasons for which they should not

12  pay the claim, but that's not addressed as a reason to pay the

13  claim in the litigation or in the letters, which...

14          MR. SMITH:  You know, your Honor has essentially made

15  the argument.  That's exactly what they were doing.  And it goes

16  back further than that.  It goes back to the April 11th, 2004,

17  letter.  And I mean one of the ways --

18          THE COURT:  Does that letter talk about these

19  problems?

20          MR. SMITH:  Absolutely.

21          THE COURT:  The indictment?

22          MR. SMITH:  It talks about beginning in April 11th.

23          THE COURT:  What exhibit number is April 11th?

24          MR. SMITH:  1.  And it's on our original motion.

25          THE COURT:  Different one.  All right.

1    **MR. SMITH:**  And it says -- it's kind of cuckoo,

2    because I had to take a picture of it.  But that is --

3         **THE COURT:**  That's an April 22nd letter.

4         **MR. SMITH:**  I'm sorry.  April 22nd of 2004.  I was

5    confusing it with the April 11th, 2005.

6         But if you look at the case law -- let me just run

7    through this real quick, because I think that --

8         **THE COURT:**  I'm trying to get to this factually

9    first.

10        **MR. SMITH:**  All right.

11        **THE COURT:**  Tell me about this April 22, 2004,

12   letter.

13        **MR. SMITH:**  What it does is it specifically

14   references Lynn Olsen and Tri-Cities Produce and Agri-Pack.  It

15   says that "these suspect contracts contain processor contract

16   language, which is suspect, as both are listed as fresh market

17   potato packers.  The contract specifications contain refusal

18   clauses which state" -- you know, the exact same thing that the

19   government will argue here, specific gravy, lower than -- less

20   than 90 percent bruise free.  They're going to be a lower of $17

21   versus $32 a ton.  They talk about the specific variety.

22        And the reason why I wanted to just mention the case

23   law is in making this calculation the most important thing that

24   the Court has to look at is whether or not the prior litigation

25   involved the same -- involved or had the opportunity to involve

1    the same transactional nucleus of facts, and that means if the

2    claim could have been brought at that time and wasn't, it's

3    still an identity of issues and identity of parties.

4              THE COURT:  Well, that would bind the parties, but --

5              MR. SMITH:  No.  But --

6              THE COURT:  Get back to who was controlling the

7    litigation.

8              MR. SMITH:  Well, RMA, and FCIC was.  And that goes

9    back to -- I mean, we can go back to -- with Mr. Gordon himself,

10   what happens is, just for an example, he makes a claim in

11   January of 2004 on his 2003 HER coverage.  He works with Nick

12   Rice throughout 2004.  Nick Rice is the adjustor for RMA.  It

13   gets up to September of 2004.  And Dave Paul with RMA writes a

14   letter saying, as you know, you don't have coverage here.

15             Well, he didn't know that.  They'd been working with

16   RMA.

17             Immediately after that, within a month, we get a

18   letter from FCIA saying we're denying your claim.

19             The same thing happens when you move now to 2005.

20   We're into April of 2005 now.  They've had this investigation

21   going since at least April 22nd of 2004 regarding these very

22   same issues, and --

23             THE COURT:  They being RMA?

24             MR. SMITH:  RMA.  And its not just Dave Paul with

25   RMA.  It's Michael Hand, who's his supervisor, Susan Choy, who's

1   his supervisor.  So they're handling these claims.

2           And as we come around into this April 11th letter

3   where it spells out, look, RMA -- or FCIA is looking for

4   guidance, one of our positions is a lot of times the language --

5   this communication between RMA an FCIA is disguised.  There's an

6   undercurrent, and that's why in that letter, the response is --

7   the April 29th letter says, again, reiterates -- I think

8   that's number 7.  Excuse me.  Exhibit 8.  And if you -- it goes

9   through Poco, Olsen, Gordon Brothers, the exact same claims and

10  years that are under review.  It doesn't include 2001/2002, but

11  2003 and 2004.  And now RMA says don't take any further action

12  relative to the disbursement of additional claim payments on

13  these policies.

14          It says -- it references the affiliate.  "This means

15  that RMA believes that the company" -- FCIA -- "or its

16  affiliates may be responsible for establishing liability outside

17  of the policy requirements."

18          THE COURT:  Where are you reading?

19          MR. SMITH:  I'm reading from -- it's the second page

20  of Exhibit 8, the second paragraph of the second page.

21          THE COURT:  All right.

22          MR. SMITH:  And but -- but you see the company takes

23  offense at that, and that's -- that's the reason --

24          THE COURT:  Who's the company?

25          MR. SMITH:  The company is FCIA.  You see, because

1    Dave Paul writes Michael Hand, says, Look, FCIA is looking for

2    guidance about whether to pay these policies.  Is that really

3    true?  Is that what's really happening?

4              RMA has been investigating these policies forever.

5              The reference to PDD in Exhibit 11 is to the Product

6    Development Division of RMA.  It says -- excuse me.  I'm getting

7    confused on the exhibits myself, but I'll get to it.

8              Yeah.  I don't want to get too scattered here.  But

9    on Exhibit 8, "RMA is not asking for any further action at this

10   time other than the request to place a hold on any pending

11   indemnity payments."  When they reference the affiliates, the

12   affiliates get a little bit upset by that.

13             **THE COURT:**  Who are the affiliates?

14             **MR. SMITH:**  FCIA.  That's the insurance company.

15             And -- and so Dave Paul writes to -- to Michael Hand

16   and -- who is the author of the April 29th letter, and he

17   says, Hey, look, the affiliates are a little bit upset about

18   that and they've been working -- FCIA's been working closely

19   with them, with RMA, in establishing liability and servicing

20   these policies.

21             In fact, these specific potato contracts that

22   they're -- is the point of their indictment were received by

23   FCIA, were even sent to PDD for review some time ago, and I

24   think there's a reference in that 2004 as to PDD as Product

25   Development Division of RMA.  So they've had them.  They're

1   sharing the information.

2           And when they get upset about the fact that Michael

3   Hand is saying, Look, the affiliates are going to be responsible

4   for this, RMA isn't going to pay as a reinsurer on this, then he

5   writes back, Well, it's cover language, don't worry about that,

6   don't worry about it, it's just coverage language to appease our

7   legal friends, FCIA shouldn't be concerned, we're going to be

8   working with them, we're going to be reinsuring.  And that's --

9   so that's the answer to the letter.

10          Well, they all decide, look, we got to get together

11  on this.  And they do.  And that happens on May 12th.  There's

12  an e-mail stream.  Everybody -- and it's everybody.  It's all

13  the RMA people, Michael -- or Chris Mahelona, Dave Paul.  I

14  think that there's -- Michael Hand is involved.  And then

15  there's their legal counsel, RMA's legal counsel, and then FCIA,

16  I think is Dave Hovland and Kevin Swanson and others and their

17  legal counsel.  And they say -- they put together -- well, the

18  exhibit showed that there was at least an hour and

19  three-quarters meeting based upon the billing statements from

20  their own attorney, right.  And in it, we see their notes.

21          Well, all those notes are all boiled down then to the

22  litigation strategy, that is, okay, now what we're going to do

23  is we're going to go out and we're going to do this, we're going

24  to get summary judgment motions against these guys on these

25  relevant issues, processor, processor contracts.  And then we're

1    going to come back, and we're going to get Gordon.

2            Now, at the same time -- if you want evidence of the

3    control, at the same time, Gordon's case is coming to an end.

4    He gets an arbitrator's ruling in his favor on May 25th of

5    2005, and RMA -- FCIA says -- or FCIA, the insurance company, at

6    that point in time as they're settling the 2003 and 2004 claim

7    says we're going to pay Gordon as we are instructed by RMA.

8    And, in fact, the one FCIA rep to another says, well, maybe you

9    want to wait until you get your written instructions from RMA.

10           **THE COURT:**  What document's that?

11           **MR. SMITH:**  Document -- I want to say 39, but just

12   let me check, your Honor.  No, it's not.

13                   (Pause in proceedings)

14           **MR. SMITH:**  46, e-mail stream, June 2nd, 2005.  This

15   is from Bruce Green.  That's the top legal counsel for FCIA.

16   "You may want to wait until you get the written instructions

17   from RMA."  And that's in response to an e-mail from Kevin

18   Swanson to him saying -- to Bruce Green saying we're going to

19   process the claims, Gordon's claims 2003 and 2004, as instructed

20   by RMA unless instructed differently by Greg or Dave.

21           And then they say the approximate indemnity, which is

22   almost exactly what the payment is.

23           But then Bruce Green, their counsel, says, "You may

24   want to wait until you get the written instructions from RMA."

25           And then the next e-mail is from Dave Paul to Kevin

1   Swanson, Dave Paul with RMA to Kevin Swanson with FCIA.  You're

2   going to settle Gordon's 2003 and 2004 policy as an approved

3   settlement, and we'll support reasonable interest on that.

4                **THE COURT:**  Which document is that?

5                **MR. SMITH:**  That is Document Number 47.

6                The next document is a letter from -- or to Brian

7   Miller from John Raekes saying that the Federal Crop Insurance

8   Corporation, RMA, FCIA, has authorized Farmer's Crop Insurance

9   Alliance to pay Gordon Brothers' 2004 AGR indemnity, and that's

10  what they did after they got the authorization from FCIA.

11               Then what happens is, if you look at it in terms of

12  claim denial, okay, RMA, Dave Paul, says we're denying Jeff

13  Gordon's claim of his 2003 AGR.  Next thing, get a letter from

14  FCIA saying we're denying it for this reason, and then they

15  litigate it.

16               In the case of Olsen Ag and Poco, they get -- they

17  come together with a strategy, and then they implement that

18  strategy by virtue of the meeting on May 12th, the decision by

19  the e-mail of May 20th, and then what they do is they -- out

20  goes the letter.  May 24th, there goes the letter to both

21  Olsen Ag and Poco, and it says exactly what FCIA -- or what RMA

22  essentially has instructed FCIA to do.  They planned that

23  litigation, and there's a reason why they didn't -- why they

24  didn't stop the payment at that point in time, because that

25  wasn't the plan.

1          In fact, your Honor, when -- when these policies --

2     the way it works is if a -- say, a farmer wants insurance, he

3     gets insurance.  He prepares all the documents, including this

4     contract, the annual farm report, everything.  All that goes to

5     the insured.  The insurer has to review it, and then pursuant to

6     the federal regulations, FCIC has to review all of that.

7          That's why -- they had the contracts.  They had all

8     this information in their possession and planned the strategy

9     that involved denying the claims, bring in it civilly, and then

10    that didn't really work out for them.

11         Even as they were going through the -- they went to

12    Judge Van Sickle.  He sent it back to arbitration.  And I'm

13    fuzzy on this, but I believe that that issue was then appealed

14    by both Poco and Olsen Ag.  Olsen Ag then was dismissed out as

15    they entered into their settlement agreement, and Poco continued

16    their litigation.  It ended up in mediation.

17         And here's the string of communication and exhibits

18    that FCIA received from FCIC in order to settle Poco's 2003

19    claim.  This is at the end of October of 2005.  At that time,

20    they've settled out Gordon.  They're in negotiations to settle

21    out Olsen Ag.  They ultimately enter Olsen Ag's release -- I

22    want to say it was -- I believe it was November.  Well, it was

23    January of 2006.  January of 2006.  But Poco is -- they entered

24    into their release, I believe -- I may have this wrong --

25    November of 2005.

1          At the end of the October, FCIA received a green

2    light from FCIC to settle Poco's 2003 claim.  And here's the

3    letter.

4          THE COURT:  What is the document number?

5          MR. SMITH:  Document number is --

6          THE COURT:  We're going to remember all this -- you

7    can't just say this is what it says.  I've got to know the

8    document.  Then I can jump over.

9          MR. SMITH:  The document number is Exhibit 23.

10          And this is on page 9 of Mr. Schwartz' original

11    memorandum.  But --

12          MR. SCHWARTZ:  It's Exhibit 23 to ECF Number 147.

13    You're working with two different pleadings.

14          THE COURT:  23.  Okay.

15          MR. SMITH:  Exhibit 23 to Document 147.  And the

16    underlying is the memorandum -- the original memorandum.

17          Am I correct?

18          MR. SCHWARTZ:  Memorandum to dismiss Count 11.

19          MR. SMITH:  All right.  And there's -- there's --

20    there's, again, kind of an undercurrent.  But this exhibit was

21    accompanied by a fax coversheet from Michael Hand to FCIA's

22    outside counsel which he said, "I hope this will resolve at

23    least this part of this mess.  Thanks for your assistance."

24          A note to the phone conference, Hand says that FCIC

25    "will reinsure us" and "want us not to proceed to appeal".  And

1  that was an issue whether or not the -- FCIA was going to take

2  the action against Poco up further or continue the appeal with

3  the Ninth Circuit.

4        And he directly says he wants them not to appeal.

5  And then the next -- the next step is they don't.  They dismiss

6  the appeal, and they settle the case.

7        **THE COURT:**  Wind her up.

8        **MR. SMITH:**  That's --

9        **THE COURT:**  Is that it?

10        **MR. SMITH:**  Well, I think that is it, your Honor.  I

11  don't have anything further.

12        **THE COURT:**  Is there anything else you want to argue?

13  Because I want to have the government respond, but I want you to

14  finish your presentation.

15        **MR. SCHWARTZ:**  We're just at this point, your Honor

16  addressing, the series of motions that Mr. Moore and

17  Mr. Smith --

18        **THE COURT:**  No.  No.  I want to get all the motions

19  you want to argue done so I can hear from the government.

20        **MR. SCHWARTZ:**  Well, then if I may.

21        **THE COURT:**  All right.  I understand your legal

22  arguments about statutory language and so forth.

23        **MR. SCHWARTZ:**  No, your Honor.  The one I'm trying to

24  address is ECF 147, which was the motion to dismiss for failure,

25  because the latter checks were not in furtherance, which ties to

1    the chronologies.

2           THE COURT:  I think that is a jury issue if the case

3    proceeds.  I don't think I can make as a matter of law a

4    statement that a check is not in furtherance of a conspiracy.

5    You may convince me otherwise in your argument, but it seems

6    like the jury would have to decide that.  If they agreed with

7    you, then you dismiss -- you give a special interrogatory that

8    said, Was this act in furtherance of the conspiracy?  If they

9    say no, then I would acquit them.

10          MR. SCHWARTZ:  Your Honor, I understand that view,

11   and frankly --

12          THE COURT:  It's in error?

13          MR. SCHWARTZ:  No.  You know, the Ninth Circuit is

14   anything but consistent on the question of factual matters that

15   can be revolved before trial.  My first inclination was, as

16   yours, that this is Rule 29-type motion.  But when I then

17   tracked backwards to the implications of it at Rule 29 time, at

18   half time, if the Court grants the motion because it's not in

19   furtherance, then we're back into legal arguments about statute

20   of limitations.  We're into --

21          THE COURT:  Isn't that just resolved by asking the

22   jury if that act was in furtherance of the conspiracy?

23          Because it seems to me --

24          MR. SCHWARTZ:  First question is going to be, Okay,

25   if the jury says it was not --

1          **THE COURT:**  Then?

2          **MR. SCHWARTZ:**  Then we're back to the questions of

3   what should -- what evidence should not have come in, and we're

4   back to the statute of limitations issues, and we may be back to

5   issues of what the -- what one circuit calls retroactive

6   misjoinder, because not all defendants are charged in Count 11.

7          And so I figured my best bet was to put it out there

8   for you, and the old saying going, The buck stops there.  So I

9   understand the Court's view that it's --

10         **THE COURT:**  Let me just -- I don't want to waste

11  time, but that count and that check, seems to me, to make all

12  this stuff that Mr. Smith has been arguing jury material,

13  because was it in furtherance of the conspiracy, or was it not.

14  And then the argument will be by you that -- I would -- I'm

15  assuming I would instruct the jury that you're instructed to --

16  you know, in connection with count so and so to make a special

17  finding as to whether or not this event was -- was in

18  furtherance of the conspiracy, whatever the legal language would

19  be.

20         And that then has made all this history relevant to

21  the jury, litigation history and all that stuff, and they'll

22  have to decide that issue.  They would have been focussing on

23  what happened when the applications were made.  But this makes

24  the -- expands the time period.  And I would suspect I would do

25  exactly what I said.  I would instruct the jury to tell me

1    whether this was in furtherance of the conspiracy, and if it

2    wasn't, I would -- and they convicted on that conspiracy count,

3    I would then entertain a motion to dismiss on the grounds that

4    it was beyond the statute of limitations.  But I think that's a

5    jury issue.

6            MR. SCHWARTZ:  Understood, your Honor.

7            MR. JOHNSTON:  Your Honor, may I address that issue?

8            I think, your Honor, on behalf of Poco --

9            THE COURT:  Anybody else going to argue something?

10           MR. VOVOS:  Yeah.

11           THE COURT:  I'm going to have to cut down the time

12   you have, because I listened to Mr. Smith and Mr. Moore for

13   about an hour, and I'm just not going to have the time.

14           MR. JOHNSTON:  I just want one or two minutes to

15   address the issue --

16           THE COURT:  All right.  Go ahead.

17           MR. JOHNSTON:  -- that you addressed to Mr. Schwartz.

18           I think, your Honor, the 11th count, the

19   January 6th check, can be decided as not in furtherance for

20   two reasons as a matter of law.

21           The first one being it's flat precluded.  The

22   strategy was a summary judgment.  A settlement is the same thing

23   as a final adjudication, and it covers everything that could

24   have been decided, and we know that they knew all of the things

25   that could have been decided.  They were going to proceed with

1  summary judgment.  They went forward with that kind of thing.

2  Then they -- they consciously with RMA's participation decided

3  without any question at all to settle the case.  That resolves

4  all of those issues.

5       It's also decidable as a -- and not a jury question,

6  your Honor, as a matter of law, because of the in furtherance

7  question.  At some point in time, a factual sequence is -- can

8  be decided as not a causal sequence, as a matter of law.  We

9  need not go further than the old law school case of Palsgraf.

10  Remember, the distance between the original event with the

11  intervening events sooner or later, as a matter of law, said

12  there cannot be a legal causation between the two.

13       Here, we have an early event, but we have a

14  settlement involving RMA.  That check was given in regard to a

15  settlement knowingly made by all parties.  And it's important.

16  FCIA isn't just an independent insurer.  It cannot issue these

17  policies, but for the regulatorily established relationship

18  between RMA and FCIC, on the one hand standpoint, and FCIA on

19  the other.

20       FCIA is absolutely dependent upon FCIC.  Follow the

21  money.  If it doesn't do what they say, it doesn't get

22  reinsured, and these documents establish that FCIA was acting

23  and had to be acting at the direction and control, because FCIC

24  controlled the money.

25       As a consequence, your Honor, that check was clearly

1    given in regard to a knowing settlement agreement that is so far

2    distant from the allegations of the complaint I think the Court

3    can decide as a matter of law that Count 11 should be dismissed.

4            Thank you.

5            **THE COURT:**  All right.

6            **MR. VOVOS:**  May it please the Court.  I'm Mark Vovos.

7    I represent Tri-Cities Produce and Blake Bennett.

8            And I'm aware of your time schedule, but at the risk

9    of being incompetent as a lawyer or getting fired, I just want

10   to make a couple comments.  I believe that you have read what

11   has been submitted by the parties.  I know you have.  But

12   this --

13           **THE COURT:**  I'll tell you again.  I have.

14           **MR. VOVOS:**  I know you have.

15           **THE COURT:**  I can't say I've got it all, you know,

16   thoroughly in mind, but I've read everything that's been filed.

17           **MR. VOVOS:**  I understand.

18           And I just want to say this on the two motions that I

19   have filed out of the six that I had filed to dismiss for

20   violation of the Sixth Amendment on behalf of Tri-Cities,

21   Citizens Protection Act and the Rules of Professional Conduct

22   and for a preindictment delay.

23           Let me just -- I've asked for evidentiary hearings on

24   both of those issues.

25           Of all of the matters -- it's interesting, judge,

1    that in my motion for preindictment delay, facts -- you say

2    facts have to control, if there are facts that would be decided

3    in a way, would this be important to the motion.

4              And the question is yes.  The United States, the

5    plaintiff in this case, for preindictment delay gets the

6    affidavit of David Paul.  Mr. Tornabene files an affidavit.

7    They're disputing evidence and reports that we have made in this

8    case.  They dispute the facts as to anything that we say as a

9    basis for our motions.  And what am I saying?

10             If -- if the evidence finds that something would be

11   true, would allow that fact to help decide the motions that I

12   have made, and the answer is yes; the attorney-client

13   relationship, the temporal sequence, the authority and the

14   participation of RMA and the federal government in this.  They

15   dispute what we allege in every count, the facts of the

16   contract, the facts of contact with an employee.

17             And, briefly, let me just say this on the Sixth

18   Amendment in this case.  The last thing I did in my reply

19   memo -- the United States after we were here in May of this

20   year, in 2011, and this Court said we want to get your witness

21   lists, they went out to this man's business, a defendant in this

22   case, Tri-Cities Produce, and got ahold of the controller.  Not

23   any advice -- I'm the attorney.  I had just come from court.

24             And they took a statement from her.  They got

25   statements from her.  This was a person -- this was a

1   supervisory employee, a person who is control, and they took the

2   statement from her.

3         And when you look at what's going on in this case,

4   one of the last documents I filed in my reply, this was an

5   e-mail that came from us from discovery.  This is the only thing

6   that's attached to my reply as Exhibit A, in the defendants'

7   reply to the United States' response.  But this is an e-mail

8   from Steve Tillotson, who's the investigator for OIG in this

9   case, to the United States, and the subject matter is

10  conflicting questions.  And he says, I'm talking to Dave Paul.

11        Who's Dave Paul?

12        Dave Paul is the head of the RMA here -- follow the

13  money -- the person who we say are controlling and influencing

14  what's going on about Blake Bennett's attorney, Diehl Rettig.

15  Diehl isn't here.  But what you have in this case, and what I've

16  said at the time that Diehl and his firm are representing

17  insurance companies in this case pertaining to Poco and

18  Mr. Gordon in arbitrations and mediations and dealing with RMA,

19  billing records show that they're billing the RMA.  Mr. Rettig

20  is representing Mr. Bennett and Tri-Cities Produce.  The

21  undisputed facts in this case show that Mr. Paul from the RMA is

22  asking Mr. Rettig's office in 2009 in the documents that have

23  been produced for the files of Olsen and -- Mr. -- Mr. Olsen and

24  3p Farms, which is owned by my client, my client's files.

25        And then he says in this e-mail of 2009, Since Rettig

1    was representing FCIA -- that's Farmer's Crop Insurance

2    Alliance -- he was acting also on the behalf of the U.S.

3    Government since FCIA was a direct contractor for the United

4    States Department of Agriculture pertaining to crop insurance.

5            You know, this -- this is what we have.  And they go

6    out in the process of this litigation after indictment and talk,

7    not only to the controller of the corporation and take a

8    statement, but they get ahold of the two other owners, Steve Cox

9    and Mark Krcma.  Now, you know, what are the circumstances about

10   that?

11           They dispute that fact.  They dispute that.  They

12   say, well, it was just a person.

13           I mean, I've cited cases about bookkeepers and --

14   just trying to show that I think that violates the law.  That

15   shows a contract.  The United States Attorneys, their office,

16   are bound by the same rules that we are.

17           And I previously got into the time of before that,

18   because in 2005 and 2006, Mr. Bennett was represented by

19   Mr. Rettig, and so was the government in this ongoing matter.

20   And I think what Mr. Schwartz has said, what these documents

21   have said, in their memorandums, what Mr. Smith, Mr. Moore have

22   said, in their documents, there's the control by the RMA and the

23   government that's involved in this.  And that's the vice of

24   what's going on.

25           Their testimony in this case that we have presented

1  was Mr. Tillotson when he testified in front of the grand jury

2  in 2005 said, Well, when the RMA first began investigating this

3  case in 2002.  That's grand jury testimony.  They go to the

4  grand jury in 2005.  That's blacked out.  But, you know, somehow

5  nothing happens.  The proceedings just stop.  They present this

6  case in 2005 to the grand jury.  And then we fast forward to

7  2011, and they summarily say, Well, we had a lot of records that

8  came in between -- in between.

9           My point is there have been violations, judge, and

10  there's -- and the facts, the attorney-client relationship, the

11  temporal sequence, would aid the Court.  And I've tried to

12  provide cases as far as the Sixth Amendment violation -- I step

13  on the time here about that, because that's significant and

14  that's important as to the sanctions and the remedies that the

15  Court has, because, yeah, we're asking that this be dismissed,

16  or, alternatively, we're asking for other sanctions.  But that's

17  why there should be an evidentiary hearing.  And I said that.

18           As far as for pretrial -- or preindictment delay, I

19  don't know what I can say.  You want to talk about disputed

20  facts about why the facts would be important, their

21  declarations, the government's declarations, raise issues of

22  fact.  The prejudice in this case is not only loss of files of

23  Mr. Walker, of other attorneys that have represented the

24  parties, the reason why these contracts were there, the advice

25  of counsel that was given at the time when Mr. Bennett went in

 1    with the OIG investigator and gave a statement in Mr. Rettig's

 2    office.

 3           And then you know -- excuse me.  Mr. Rettig is dead

 4    now, and this -- and this delay -- it's impossible for me to

 5    concede after trying to indict in 2005 that there's some reason

 6    to take somebody six years to go ahead and start this.  And

 7    they're still out investigating.  They tell this Court in 2011,

 8    We want to have a protective order in this case, because if

 9    people find out about what's going on, the truth may not come

10    out in the investigation that's going on.

11           Judge, I've asked for at least an evidentiary hearing

12    on those two matters, and I didn't want to be last after I'd

13    asked for a continuance after listening to the argument of

14    those.

15           That's all I have to say.

16           The Daubert matter, I've said what I can say on the

17    Daubert motion.  It's a Rule 16.  There's no basis.

18           **THE COURT:**  I've read it.

19           **MR. VOVOS:**  I know you have.

20           That's all I wanted to say.  Thank you, judge.

21           **THE COURT:**  Anything else?

22           **MR. SMITH:**  Your Honor, I just want to make one

23    comment.

24           As I sat down, I noted I did forget one matter.

25           It's our position that the release -- and I'm

STEPHANIE SMITHSON, CRR, RMR

1 speaking specifically about Mr. Gordon's release.  It's Exhibit

2 49.  But the language that's in the release is just so expansive

3 as to release Farmers for itself, its insurance companies,

4 heirs, employees, agents, related companies, predecessors,

5 successors and assigns.  And so we believe that that -- and of

6 all claims with regard to 2003/2004 -- that the effect of that

7 release was never responded to by the government.

8                         (Portion of partial proceedings were

9                         concluded at 11:42 a.m.)

10                              --o0o--

1

2                        **CERTIFICATE OF REPORTER**

3          I, STEPHANIE SMITHSON, Official Reporter for the

4   United States Court, Eastern District of Washington, hereby

5   certify that the foregoing proceedings in CR-11-6001-RHW-1

6   through 7, U.S. v. Lynn Olsen, et al. were reported by me, a

7   certified shorthand reporter, and were thereafter transcribed

8   under my direction into typewriting; that the foregoing is a

9   full, complete and true record of said proceedings as bound by

10  me at the time of filing.

11         The validity of the reporter's certification of said

12  transcript may be void upon disassembly and/or removal from the

13  court file.

14

15                        s/ Stephanie Smithson

16              _____

                      Stephanie Smithson, CRR, RMR

17                  Thursday, December 15, 2011

18

19

20

21

22

23

24

25